CLOSED

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: <u>1:25–mj–00203–CLP</u>–1

Case title: USA v. Park

Date Filed: 06/04/2025

Date Terminated: 06/04/2025

Assigned to: Magistrate Judge
Cheryl L. Pollak

**<u>Defendant (1)</u>**

**Daniel Jongyon Park**
*TERMINATED: 06/04/2025*

represented by **Jeffrey Steven Dahlberg**
Federal Defenders of New York
One Pierrepont Plaza
16th Floor
Brooklyn, NY 11201
718–407–7411
Fax: 718–855–0760
Email: jeff_dahlberg@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*

**<u>Pending Counts</u>**                                            **<u>Disposition</u>**

None

**<u>Highest Offense Level (Opening)</u>**

None

**<u>Terminated Counts</u>**                                        **<u>Disposition</u>**

None

**<u>Highest Offense Level
(Terminated)</u>**

None

**<u>Complaints</u>**                                                   **<u>Disposition</u>**

18:2339A.F

**<u>Plaintiff</u>**

**USA**                                  represented by  **Vincent Martin Chiappini**
                                                          Department of Justice
                                                          US Attorney's Office (EDNY)
                                                          271–A Cadman Plaza East
                                                          Brooklyn, NY 11201
                                                          718–254–6299
                                                          Email: Vincent.Chiappini@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Government Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/04/2025 | 6 | Notice to Central District of California of a Rule 5 or Rule 32 Initial Appearance as to Daniel Jongyon Park. Your case number is: 25 MJ 400. Docket sheet and documents attached. (If you require certified copies of any documents, please send a request to [InterDistrictTransfer_NYED@nyed.uscourts.gov]. If you wish to designate a different email address for future transfers, send your request to InterDistrictTransfer_TXND@txnd.uscourts.gov.) (DW) (Entered: 06/04/2025) |
| 06/04/2025 | 5 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations as to Daniel Jongyon Park. Ordered by Magistrate Judge Cheryl L. Pollak on 6/4/2025. (DW) (Entered: 06/04/2025) |
| 06/04/2025 | 4 | CJA 23 Financial Affidavit by Daniel Jongyon Park (DW) (Entered: 06/04/2025) |
| 06/04/2025 | 3 | WAIVER of Rule 5(c)(3) Hearing by Daniel Jongyon Park (DW) (Entered: 06/04/2025) |
| 06/04/2025 | 2 | COMMITMENT TO ANOTHER DISTRICT as to Daniel Jongyon Park. Defendant committed to the Central District of California.Ordered by Magistrate Judge Cheryl L. Pollak on 6/4/2025. (DW) (Entered: 06/04/2025) |
| 06/04/2025 | | Minute Entry for proceedings held before Magistrate Judge Cheryl L. Pollak:Arraignment as to Daniel Jongyon Park (1) Count Complaint held on 6/4/2025, Attorney Appointment Hearing as to Daniel Jongyon Park held on 6/4/2025, Initial Appearance in Rule 5(c)(3) Proceedings as to Daniel Jongyon Park held on 6/4/2025. AUSA Vincent Chiappini present. Defendant present with FDNY Jeffrey Dahlberg. Government agent sworn. Defendant arraigned on a removal complaint to the Central District of California. Defendant waived identity hearing and a preliminary hearing in this district. The defendant reserved a right to a preliminary hearing in the Central district of California. The government opposed bail for reasons stated on the record. Defense counsel did not have a bail application to present at this time. Commitment order entered. The defendant is remanded into the custody of the U.S. Marshals. A date to appear in the Central District of California will be given to defense counsel once a date is set in that district. Rule 5F warning given to the government. Medical memo issued. (Time Log #2:50–3:07 6/4/2025.) (DW) (Entered: 06/04/2025) |
| 06/04/2025 | | Arrest (Rule 40) of Daniel Jongyon Park (DW) (Entered: 06/04/2025) |
| 06/04/2025 | 1 | RULE 40 AFFIDAVIT by USA as to Daniel Jongyon Park by Affiant RULE 5 AFFIDAVIT/ REMOVAL to the Central District of California (DW) (Entered: 06/04/2025) |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        -v-<br><br>Daniel Jongyon Park,<br><br>Defendant(s). | 25 MJ 203<br><u>ORDER</u> |

Cheryl Pollak, United States Magistrate Judge:

This Order is entered, pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No 116–182, 134 Stat. 894 (Oct. 21, 2020), to confirm the Government's disclosure obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations.

The Government must disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" and that is known to the Government. *Id.* at 87. This obligation applies regardless of whether the defendant requests this information or whether the information would itself constitute admissible evidence. The Government shall disclose such information to the defense promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case.

As part of these obligations, the Government must disclose any information that can be used to impeach the trial testimony of a Government witness within the meaning of *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny. Such information must be disclosed sufficiently in advance of trial in order for the defendant to make effective use of it at trial or at such other time as the Court may order.[1]

---

[1] This Order does not purport to set forth an exhaustive list of the Government's disclosure obligations.

The foregoing obligations are continuing ones and apply to materials that become known to the Government in the future.  These obligations also apply to information that is otherwise subject to disclosure regardless of whether the Government credits it.

In the event the Government believes that a disclosure under this Order would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of its obligations, which may include in camera review or withholding or subjecting to a protective order all or part of the information otherwise subject to disclosure.[2]

For purposes of this Order, the Government has an affirmative obligation to seek all information subject to disclosure under this Order from all current or former federal, state, and local prosecutors, law enforcement officers, and other officers who have participated in the prosecution, or investigation that led to the prosecution, of the offense or offenses with which the defendant is charged.

If the Government fails to comply with this Order, the Court, in addition to ordering production of the information, may:

(1) specify the terms and conditions of such production;

(2) grant a continuance;

(3) impose evidentiary sanctions;

(4) impose contempt or other sanctions on any lawyer responsible for violations of the Government's disclosure obligations, or refer the matter to disciplinary authorities;

(5) dismiss charges before trial or vacate a conviction after trial or a guilty plea; or

(6) enter any other order that is just under the circumstances.

---

[2] The Classified Information Procedures Act sets forth separate procedures to be followed in the event that the Government believes matters relating to classified information may arise in connection with the prosecution.  *See* 18 U.S.C. app. 3 §§ 1 *et seq.*

SO ORDERED.

Dated: June 4, 2025
   BROOKLYN, NY

             S / Cheryl Pollak
           United States Magistrate Judge

AO 466A (Rev. 12/17) Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

# UNITED STATES DISTRICT COURT
### for the
Eastern District of New York ☑

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. 25 MJ 203 |
| ) | |
| Daniel Jongyon Park ) | Charging District's Case No. 25 MJ 400 |
| _Defendant_ ) | |

## WAIVER OF RULE 5 & 5.1 HEARINGS
### (Complaint or Indictment)

I understand that I have been charged in another district, the _(name of other court)_ _____.

I have been informed of the charges and of my rights to:

(1)     retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2)     an identity hearing to determine whether I am the person named in the charges;

(3)     production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;

(4)     a preliminary hearing to determine whether there is probable cause to believe that an offense has been
committed, to be held within 14 days of my first appearance if I am in custody and 21 days otherwise,
unless I have been indicted beforehand.

(5)     a hearing on any motion by the government for detention;

(6)     request a transfer of the proceedings to this district under Fed. R. Crim. P. 20, to plead guilty.

I agree to waive my right(s) to:

☐     an identity hearing and production of the warrant.

☐     a preliminary hearing.

☐     a detention hearing.

☑     an identity hearing, production of the judgment, warrant, and warrant application, and any preliminary
or detention hearing to which I may be entitled in this district. I request that my
☑ preliminary hearing and/or ☑ detention hearing be held in the prosecuting district, at a time set by
that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are
pending against me.

Date: _6/4/25_

_Defendant's signature_

_Signature of defendant's attorney_

Jeffrey S. Dahlberg

_Printed name of defendant's attorney_

AO 94  (Rev. 06/09) Commitment to Another District

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| United States of America | ) | |
| v. | ) | Case No.  25 MJ 203 |
| Daniel Jongyon Park | ) | |
| *Defendant* | ) | Charging District's Case No.  25 MJ 400 |

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the _____Central_____ District of _____California_____ ,

*(if applicable)* _____ division.  The defendant may need an interpreter for this language:

_____ .

The defendant:    ☐  will retain an attorney.

☑  is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant.  The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled.  The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date:  6/4/25

_____

*Printed name and title*

NEM:VC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | REMOVAL TO THE CENTRAL DISTRICT OF CALIFORNIA |
| - against - | (Fed. R. Crim. P. 5) |
| DANIEL JONGYON PARK, | |
| Defendant. | Case No. 25-MJ-203 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

Andrew Bland, IV, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

On or about June 4, 2025, the United States District Court for the Central District of California issued a warrant for the arrest of the defendant DANIEL JONGYON PARK for violating Title 18, United States Code, Section 2339A (Providing and Attempting to Provide Material Support to Terrorists).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.     On or about June 4, 2025, the defendant DANIEL JONGYON PARK was charged pursuant to a Complaint with violating Title 18, United States Code, Section 2339A

---

[1]     Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

(Providing and Attempting to Provide Material Support to Terrorists).   A true and correct copy of the Complaint is attached as Exhibit A.

2.      In connection with the Complaint, on or about June 4, 2025, the United States District Court for the Central District of California issued an arrest warrant for the defendant (the "Arrest Warrant").   A true and correct copy of the Arrest Warrant is attached as Exhibit B.

3.      On or about June 3, 2025, FBI special agents arrested the defendant DANIEL JONGYON PARK at John F. Kennedy Airport in Queens, New York based on probable cause.

4.      At the time of his June 3, 2025 arrest, the defendant DANIEL JONGYON PARK had on his person a U.S. passport and Washington state driver's license.   The photographs in both the passport and driver's license matched PARK's appearance, and the name and date of birth on both the passport and the driver's license matched those of the DANIEL JONGYON PARK who was under investigation in the Central District of California and who has since been charged in the Complaint and is wanted in the Arrest Warrant.   Law enforcement agents also compared the physical appearance of the defendant PARK to a photograph of PARK obtained during the investigation of PARK in the Central District of California, and he appeared consistent with the person depicted in this photograph.

5.      Based on the foregoing, I submit that there is probable cause to believe that the defendant is the DANIEL JONGYON PARK wanted in the Central District of California.

WHEREFORE, your deponent respectfully requests that the defendant DANIEL JONGYON PARK be removed to the Central District of California so that he may be dealt with according to law.

Andrew Bland, IV
Special Agent
Federal Bureau of Investigation

Sworn to before me this
4ᵗʰ day of June, 2025

THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# EXHIBIT A

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

| LODGED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| **06/04/2025** |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ____DVE____ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| **FILED** |
| --- |
| June 4, 2025 |
| CENTRAL DISTRICT OF CALIFORNIA SOUTHERN DIVISION AT SANTA ANA BY *Nancy Brscino* Deputy Clerk, U.S. District Court |

United States of America

v.

DANIEL JONGYON PARK,

Defendant

Case No. 5:25-mj-00400-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on an unknown date and continuing through at least May 17, 2025, in the county of Riverside and elsewhere in the Central District of California, the defendant violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 2339A | Providing and Attempting to Provide Material Support to Terrorists |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Andrew R. Bland, IV
_____
*Complainant's signature*

Andrew R. Bland, IV, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    June 4, 2025
_____

City and state:    Santa Ana, ~~Los Angeles~~ California

_____
*Judge's signature*

Hon. Douglas F. McCormick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSAs: S. Gerdes (x4699) and A. Boylan (x2170)

## AFFIDAVIT

I, Andrew R. Bland, IV, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Daniel Jongyon Park ("PARK") for a violation of 18 U.S.C. § 2339A: Providing and Attempting to Provide Material Support to Terrorists.[1]

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

### II. BACKGROUND OF AFFIANT

3.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since April of 2021. Prior to working for the FBI, I worked as a State Trooper with the Texas Department of Public Safety from September of

---

[1] Title 18, United States Code, Section 2339A, makes it unlawful to provide or attempt to provide material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of certain specified offenses, including Title 18, United States Code, Section 2332a (Use of a Weapon of Mass Destruction).

1

2016 through March of 2021.  I am currently assigned to the
FBI's Los Angeles Field Office, Riverside Resident Agency, Joint
Terrorism Task Force, where I investigate, among other things,
people who commit violent criminal acts in furtherance of their
political or social ideology, and investigate threats associated
with the use of firearms, chemical, biological, radiological,
nuclear, and explosive materials.  As a Special Agent, I have
received both formal and informal training from the FBI
regarding domestic and foreign terrorism investigations.
Through my training and experience, I am familiar with the
methods of operation that individuals associated with domestic
and foreign terrorist organizations employ to communicate with
associates regarding their ideology, to organize actions on
behalf of their organizations, and to bring attention to their
political and social agendas.  As an FBI Special Agent, I have
also participated in the execution of multiple arrest and search
warrants, including warrants executed in cases involving
domestic terrorism and threats.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.   Guy Edward Bartkus ("BARTKUS") drove a car containing
an explosive device to a fertility clinic in Palm Springs,
California, on May 17, 2025.  BARTKUS detonated the bomb,
resulting in BARTKUS's death, injuries to numerous victims, the
destruction of the fertility clinic's building, and damage to
surrounding buildings and areas.  BARTKUS's attack was motivated
by his pro-mortalism, anti-natalism, and anti-pro-life ideology,

which is the belief that individuals should not be born without their consent and that non-existence is best.

5.    Daniel Jongyon Park ("PARK"), who shares BARTKUS's pro-mortalism, anti-natalism, and anti-pro-life ideology, shipped approximately 180 pounds of ammonium nitrate, which is an explosive precursor, to BARTKUS in January 2025.  In May 2025, PARK purchased an additional 90 pounds of ammonium nitrate that was shipped to BARTKUS days before the Palm Springs bombing.

6.    Following the bombing, federal agents executed search warrants at PARK's residence in Kent, Washington.  Inside, agents found explosive precursor chemicals and multiple recipes for explosives, including recipes for explosive mixtures containing ammonium nitrate and fuel.  Specifically, one of the recipes that law enforcement found at PARK's house was a recipe for ammonium nitrate and nitromethane (a fuel) -- the same explosive mixture that was used to cause the truck explosion in the 1995 Oklahoma City bombing.

7.  As detailed below, in January 2025, PARK shipped approximately 180 pounds of ammonium nitrate to BARTKUS. Shortly thereafter, PARK traveled to BARTKUS's house in Twentynine Palms, California, where he stayed for approximately two weeks.  Three days before PARK arrived at BARTKUS's house, BARTKUS researched how to make powerful explosions using ammonium nitrate and fuel.  According to BARTKUS's family members, during PARK's stay with BARTKUS, PARK and BARTKUS were "running experiments" in BARTKUS's detached garage.  After the

bombing, FBI recovered large quantities of chemical precursors and laboratory equipment in the detached garage.

8.    Four days after BARTKUS conducted the suicide bombing, PARK left the United States for Europe.  On May 30, 2025, PARK was detained in Poland and later ordered deported to the United States.  On the evening of June 3, 2025, PARK was arrested by FBI special agents shortly after his flight from Poland arrived at JFK International Airport.

### IV. STATEMENT OF PROBABLE CAUSE

9.    Based on my review of law enforcement reports and evidence, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.    BARTKUS Bombed a Fertility Clinic on May 17, 2025

10.    On May 17, 2025, BARTKUS drove a car containing an explosive device to a fertility clinic[2] in Palm Springs, California.  The explosive device detonated, resulting in BARTKUS's death, injuries to numerous victims that required hospital treatment, the destruction of the fertility clinic's building, and damage to surrounding buildings and areas.  The blast was so powerful that it resulted in human remains being flung as far as the rooftop of a hotel a block away from the blast site and shattered windows on buildings on the blocks

---

[2] Based on my review of the fertility clinic's public website, which includes information about financing treatments, utilizing insurance, and service advertisements, the fertility clinic is an operation involved in interstate and/or foreign commerce.

4

surrounding the fertility clinic.  Near the exploded car, law
enforcement found a weapon that appeared to be an AR-style
firearm with spent shell casings on the ground.

     11.   Law enforcement recovered a cellphone that BARTKUS had
set up to record the bombing.  Based on a search of that
cellphone pursuant to a federal search warrant, it contained an
image that showed the car BARTKUS used the day of the bombing
parked outside of the fertility clinic prior to the bombing.
This image on the phone was labeled with "Promortalism" on the
lower left side of the image.

     12.   Based on records obtained from a domain registrar, I
know BARTKUS created a website called promortalism.com.  Based
on my review of promortalism.com, records obtained from a known
website host ("Website Host 1"), and a witness tip
("Witness 1"), BARTKUS posted on the site an audio-recorded
manifesto, a countdown to the bombing, and a video of the
suicide bombing.

       a.   In his online manifesto, BARTKUS acknowledged
that by bombing the fertility clinic, he was "causing
destruction and probably possibly death."  BARTKUS explained
that a pro-mortalist seeks to "make the death thing happen
sooner rather than later in life."  BARTKUS discussed why he
bombed a fertility clinic, explaining, "IVF is like kinda the
epitome of pro-life ideology so see fuck IVF, fuck IVF clinics."

       b.   The video recording of the bombing captured
BARTKUS talking to the camera, going into the car backed up to

the fertility clinic, remaining in the car for about thirty minutes, and finally, the explosion of the clinic.

13. The FBI laboratory provided a preliminary analysis that the explosive device used in the bombing of the fertility clinic on May 17, 2025, meets the definition of a "destructive device," as defined in 18 U.S.C. § 921 and 26 U.S.C. § 5845(f).

**B. PARK Held the Same Extremist Ideological Views that Motivated BARTKUS to Bomb the Fertility Clinic**

14. During an interview with the FBI, one of PARK's family members stated that PARK, who is now in his early 30s, has made statements consistent with pro-mortalism ideology as far back as high school. Records from a social media platform ("Social Media Provider 1") show that, as far back as 2016, an account registered to a known email address for PARK made multiple comments in forums titled "promortalism" and "antinatalism" – the same ideology that motivated BARTKUS to bomb the fertility clinic.

15. In a March 2025 public post on Social Media Provider 1's platform, PARK posted: "Any Antinatalists or adjacent around WA state or PNW USA?" The post continued, "I wanna [sic] join a local group so we can start **some protests** or just any in-person events. Or if there isn't one yet, I can make [Encrypted Messaging Application 1] chat or a [Social Media Platform 2[3]] server? Considering our position, I like the extra

---

[3] Based on my training and experience, Encrypted Messaging Application 1 and Social Media Platform 2 are an application and platform, respectively, that are commonly used by individuals
*(footnote cont'd on next page)*

security of [Encrypted Messaging Application 1], but I
understand if most people prefer [Social Media Platform 2]."
(Emphasis added.)  On this post, the text "You deserve eternal
rest" appeared next to PARK's Social Media Platform 1 username.
Based on my knowledge about Social Media Platform 1, this
appears to be either a message that PARK added to his profile or
a badge that PARK earned to display next to his profile based on
engagement on the forum.

        16.  During an interview with one of BARTKUS's family
members on May 18, 2025, he/she stated that BARTKUS planned to
**"protest"** and asked to use his/her car on Friday, May 16, 2025,
but since he/she needed the car for work, he/she encouraged
BARTKUS to go the following day, Saturday, May 17, 2025, to
which BARTKUS agreed.  When BARTKUS took his family member's car
to blow up the fertility clinic on May 17, 2025, he told his
family member that he was going out for a **"protest."**

        17.  Based on law enforcement review of posts on Social
Media Platform 1, I know PARK posted the following:

        a.   In 2016, PARK made a post titled, "Anyone else
chose to live as sacrificing yourself for the sake of preventing
more suffering?"  The content of the post discussed anti-
natalism as a positive and emphasized pushing the concept to
others.  The post started with, "I would've been dead by now if
it weren't for the fact that everyone else is suffering too."
Later, the post stated, "When people are lost and distraught,

---

who seek to evade law enforcement detection due to their
encrypted nature and other security features.

**death is always an option.**" (Emphasis added.) The post ended
with, "You just have to talk to one person, not people. Anyway,
I just think we can do more than you think you can."

    b.   In 2016, PARK responded to the following
question: "What have you actually done to not have children? An
abortion, a vasectomy?" PARK responded, "I think a better
question is **what did you do to make other people not have
children.** I don't think I did much. Dunno what I can do about
other people. I just try to mention it when people seem like
they're willing to listen." (Emphasis added.)

    c.   In April 2025, PARK posted "Yes" in response to
the question: "If you had the technology to wipe out a tribe of
people on an isolated island and no one would know about it
after the tribe's life was gone, would you press the button to
end their suffering and speed up the process of extinction of
life on Earth?"

    **C.    PARK and BARTKUS Conducted "Experiments" Inside
           BARTKUS's Garage, Where Law Enforcement Later Found a
           Significant Quantity of Bomb-Making Materials**

18. During a search at BARTKUS's house on May 18, 2025,
pursuant to a federal warrant, the FBI found large quantities of
precursor chemicals and completed explosive mixtures for
explosive devices and laboratory equipment in the detached
garage.[4] From BARTKUS's bedroom, the FBI recovered a voltmeter,

---

    [4] Based on a preliminary laboratory analysis, some of these
precursor chemicals include nitric acid and aluminum powder, and
completed explosive mixtures include erythritol tetranitrate
("ETN").

a soldering station, two 3D printers, pre-made electronic
components, various circuitry components, ceramic ball bearings,
and cellphones that were in various stages of disassembly.

19.  Based on witness interviews, financial records, and
rental car documents, I know that PARK traveled to BARTKUS's
residence and stayed with BARTKUS and his family from
approximately January 25, 2025 to February 8, 2025.  Based on
interviews with BARTKUS's family members, PARK concealed his
identity while staying with BARTKUS and his family by pretending
that his name was "Steve."[5]

20.  The text messages between BARTKUS's family members
described that "Steve" (PARK) and BARTKUS were in BARTKUS's room
as well as the detached garage "running experiments."  This
detached garage was the same garage where law enforcement
located significant amounts of precursor chemicals and completed
explosive mixtures commonly used in the construction of homemade
explosive devices.

21.  BARTKUS's family member also told the FBI that PARK
wore a gold-colored jacket during his stay at BARTKUS's house.
PARK's family member told the FBI that when PARK returned to his
residence in Washington, he had burned his jacket.  During a
search of PARK's house pursuant to a search warrant, law
enforcement recovered PARK's burnt gold-colored jacket.

---

[5] Although BARTKUS's family knew PARK as "Steve," BARTKUS's
family members later identified "Steve" as PARK.

**D.    Between June 2024 and May 2025, PARK Sent BARTKUS Large Amounts of Ammonium Nitrate, Including Purchasing Two Orders Days Before BARTKUS Committed the Suicide Attack**

22.    During the search of BARTKUS's house on May 18, 2025, the FBI found two white packages addressed to "Anya Folger" in the detached garage.  One of the packages had a sticker on it that listed PARK's family member's name and PARK's home address. The two white packages addressed to "Anya Folger" appear to be approximately the same size, and both packages had raw brown cardboard on the package where it appeared some of the white cardboard had been torn or removed in some fashion.   The shipping labels on both "Anya Folger" packages stated that the weight for each package was approximately 45 pounds.

23.    The return entity listed on the labels of the packages shipped to "Anya Folger" was a company in Washington state ("Company 1").  On PARK's public-facing LinkedIn page, Company 1 is listed as PARK's employer from 2021 to present. Additionally, PARK's bank records showed that PARK received direct deposits from Company 1.  PARK's family member told the FBI that PARK worked at Company 1 in its shipping department. FBI interviews conducted at Company 1 confirmed PARK's employment.

24.    When both "Anya Folger" packages were found in BARTKUS's detached garage, they were empty and near two other white boxes that were approximately the same size and that were open, empty, and marked with a company logo and the labeling "outlawXstore.com" (the "'Outlaw' boxes").  Based on FBI agents'

10

visual inspection of these boxes, it appeared that the cardboard
that was removed from the "Anya Folger" packages was in
approximately the same location where the "outlawXstore.com"
branding appeared on the "Outlaw" boxes.  The shipping labels
for the "Outlaw" boxes stated that the weight of each package
was approximately 47 pounds.

25.  During a search of BARTKUS's house on May 29, 2025,
FBI seized a white box and a brown box, both with the shipping
label addressed to "Anya Folger" and with PARK's employer
(Company 1) as the sender.  The white box had similar cardboard
removed as the previously seized boxes.

26.  Shipping records showed that four packages were
shipped in January 2025 to BARTKUS's house addressed to "Anya
Folger."  The shipping records also showed that these four
packages had the same dimensions (13 inches x 13 inches x
13 inches) and a weight of 45 pounds.  The records listed
Company 1 (PARK's employer) as the sender.  Labels for these
four packages were created on January 15, 2025.  The four
packages arrived at BARTKUS's house on January 21, 2025,
January 22, 2025 (two of the packages), and January 29, 2025 --
right before and during the time when PARK stayed with BARTKUS
at BARTKUS's house.[6]

---

[6] During an interview, PARK's family member (who also works
for Company 1) explained that he/she helped PARK re-ship the
packages to a friend in California.  The family member
specifically recalled sending packages to persons named "Guy"
and "Anya Folger."  The family member explained that PARK had
access to Company 1's shipping label system, and during the
search of PARK's house, the family member showed the FBI how to
access the shipping label system.  BARTKUS's family member also
told the FBI that PARK sent BARTKUS packages.

11

27.   Based on records from Carolina Chemical, on
February 8, 2025, a customer listed as "Guy Bartkus" attempted
to purchase chemical material -- specifically, Acetic Anhydride[7]
ACS Reagent -- using a known debit card for PARK ("PARK Debit
Card 1").  This transaction was declined.  Approximately one
minute later, another transaction to purchase Acetic Anhydride
ACS Reagent was attempted, but ultimately declined, by a user
named "Dan Park" using PARK Debit Card 1.  Approximately two
minutes later, "Dan Park" attempted a third transaction to
purchase Acetic Anhydride ACS Reagent using PARK Debit Card 1,
which was accepted for $63.19.  The shipping information within
the receipt for this purchase was addressed to "Dan Park" at
BARTKUS's address.

28.   Records from www.outlawxstore.com, which redirects to
www.ammoniumnitrateforsale.com ("WEBSITE 1"),[8] show that PARK
made six separate purchases totaling 275 pounds of ammonium
nitrate between October 2022 and May 2025:

a.    PARK purchased 50 pounds of ammonium nitrate on
October 25, 2022, with the name "Daniel Park"; an old known
address for PARK; a known email address for PARK ("PARK
Email 1"); and a known phone number for PARK ("PARK Phone Number
1").

---

[7] Based on information from bomb technicians working on this
investigation, this chemical is not commonly used in the
development of homemade explosive devices.

[8] Based on FBI's review, WEBSITE 1 is an online retail store
that primarily markets the sale of ammonium nitrate for its use
in the construction of exploding targets, and based on my
training and experience, I know that ammonium nitrate is a
chemical that can be used in explosive mixtures.

  b. PARK purchased 45 pounds of ammonium nitrate on February 4, 2024, using PARK Debit Card 1, with the name "Da"; PARK's home address; PARK Email 1; and PARK Phone Number 1.

  c. PARK purchased 45 pounds of ammonium nitrate on June 26, 2024, using PARK Debit Card 1, with the name "Dan Park"; PARK's home address; PARK Email 1; and PARK Phone Number 1.

  d. PARK purchased 45 pounds of ammonium nitrate on December 26, 2024, using PARK Debit Card 1; PARK's family member's name; a slight misspelling of PARK's home address; and PARK Phone Number 1.

  e. On May 6, 2025, eleven days before the bombing, PARK paid for two orders, each for 45 pounds of ammonium nitrate, from WEBSITE 1 using the name "Guy Barktus" (a misspelling of BARTKUS's name). A debit card in PARK's name ("PARK Debit Card 2") was used to purchase this ammonium nitrate for a total price of $126.44 each. Records from an email provider ("Email Provider 1"), show that PARK Email 1 received two emails dated May 9, 2025, from an e-commerce email address that listed the "reply-to" address as outlawxstore@gmail.com.

  29. According to shipping records, on May 6, 2025, the same date as the ammonium nitrate orders, a shipment from Duda Energy LLC was sent to "Guy Bartkus" at BARTKUS's address. According to open-source records, Duda Energy LLC's website is https://www.dudadiesel.com/ and is described as "DudaDiesel – Biodiesel, Chemical & Solar Supplies, Alternative Energy Store."

Based on my training and experience, I know ammonium nitrate and diesel fuel can be combined to create an explosive.

30.    Based on information provided by agents with the Bureau of Alcohol, Tobacco, and Firearms and Explosives, neither PARK nor BARTKUS has any firearms or destructive devices registered to them within the National Firearms Registration and Transfer Record.

**E.    BARTKUS Searched for Information About Explosives and Ammonium Nitrate Days Before PARK Visited BARTKUS and After PARK Purchased Ammonium Nitrate**

31.    On the phone that BARTKUS set up across from the fertility clinic to capture the bombing on May 17, 2025, the FBI saw a series of chats on an artificial intelligence ("AI") search engine and chat application ("AI Chat Application 1"). Included in these chats were questions to AI Chat Application 1 about explosives, diesel, gasoline mixtures, and detonation velocity.

32.    For example, on January 22, 2025, approximately three days before PARK visited BARTKUS, BARTKUS asked AI Chat Application 1 the following:

    a.    "So, when making ANFO[9] by mixing ammonium nitrate and diesel, would it be a good idea to fractionally distill the diesel and test the different components and see which one

---

[9] Based on open-source information and my training and experience, ANFO stands for Ammonium Nitrate/Fuel Oil. It is a widely used industrial explosive, typically composed of 94% ammonium nitrate and 6% fuel oil, often diesel. The ammonium nitrate acts as an oxidizer, while the fuel oil provides the combustion source.

produces a higher detonation velocity,[10] or are there too many different components?"

b.    The chat also included the additional following chats and responses:

i.    **BARTKUS**: "Well, to counter a few of your points, for example, point number two that you made, it's known that certain types of fuels, when mixed with ammonium nitrate, can produce very significantly varying results in terms of detonation velocity.  For example, hydrazine.  And to counter your other point about there being too many different hydrocarbons, theoretically, you could separate it out into maybe five different component ranges based on boiling points and test those and see if any one of them is better than just diesel on its own, right?"

ii.    **AI Chat Application 1 Response**: "You make an excellent point, and I agree that exploring fractions of diesel for optimization could theoretically yield meaningful insights into ANFO performance. . . ."

33.    Based on my review of these chats and information from FBI bomb technicians, these chats discuss determinations about what make-up of an explosive mixture using ammonium nitrate, diesel fuel, and other components results in the most powerful blast (i.e., highest detonation velocity).

---

[10] Based on information from bomb technicians, a higher detonation velocity results in a more powerful blast.

**F.  PARK Communicated with BARTKUS Using Encrypted Messaging Application 1 that Was Set to Auto-Delete as of January 22, 2025**

34.  Based on FBI's review of BARTKUS's phone set up to record the bombing, the phone contained Encrypted Messaging Application 1.  Encrypted Messaging Application 1 on the phone had only two chats open.  One of those chats was with an account with the display name "DanPark."  Based on the FBI's review of this chat and agents' understanding of Encrypted Messaging Application 1, this chat was set to auto-delete as of January 22, 2025, which is days before PARK's arrival at BARTKUS's house.  In March 2025, PARK wrote on Social Media Platform 1 that Social Media Platform 1 was his preferred application to chat with other pro-mortalists because he "like[d] the extra security" of it.

**G.  PARK Possessed Explosive Precursors and Explosive Recipes in His Bedroom**

35.  During the search of PARK's house on May 31, 2025, pursuant to a federal search warrant, FBI agents recovered multiple explosive precursors from PARK's room.  For example, FBI agents recovered 945 grams of ammonium nitrate.  Based on information from FBI bomb technicians, the ammonium nitrate that they recovered stood out because it was no longer prilled, i.e., it was ground down to a powder.  According to FBI bomb technicians, to have a functional explosive device with powdered ammonium nitrate, it would have to be combined with a solid fuel.  FBI agents also recovered solid fuels from PARK's room, in addition to laboratory equipment in PARK's closet.  PARK's

16

family members told the FBI that PARK was interested in chemistry.

36.    Inside PARK's room, agents also recovered hand-written notes of chemical explosive equations.  Some of these equations included explosive mixture recipes using ammonium nitrate and fuel.  One of the recipes was for ammonium nitrate and nitromethane (a fuel), the same explosive mixture that was used to cause the truck explosion in the 1995 Oklahoma City bombing.  The document also contained the recipe for pentaerythritol tetranitrate ("PETN"), which based on my training and experience and conversations with FBI bomb technicians, I know to be a high explosive.  PETN has similarities to ETN, which was found at BARTKUS's house.  During an interview, Witness 1 explained that BARTKUS expressed an interest in PETN.

37.    During a search of PARK's car pursuant to a federal warrant, FBI agents recovered a firearm, specifically, an unregistered Glock 19.

**H.    Preliminary Laboratory Testing is Consistent with Ammonium Nitrate Having Been Used to Create the Destructive Device Used to Bomb the Fertility Clinic**

38.    Preliminary analysis from the FBI's laboratory showed that items analyzed from the blast site contain, among other ions, nitrate ions.  These nitrate ions could indicate the use of a nitrate-based oxidizer, such as potassium nitrate or ammonium nitrate.  The ions identified could also be inherent to the material submitted or the collection environment.

39. Therefore, based on my communications with law enforcement agents, the items analyzed from the blast are consistent with, though do not conclusively establish, ammonium nitrate having been used as an oxidizer for the explosive mixture in the May 17 bombing of the fertility clinic.

### I.    PARK and BARTKUS Have Visited Each Other Previously, and PARK Has Transferred Money to BARTKUS

40. BARTKUS's family member told law enforcement that PARK had visited BARTKUS another time during the summer of 2023 or 2024. Bank records show that a debit card in PARK's name and home address made a series of purchases in the areas of Palm Springs and Twentynine Palms (where BARTKUS lives) in late July 2024. Based on these facts, I believe PARK visited BARTKUS in Southern California in July 2024. PARK's family member told the FBI that he/she believed BARTKUS had visited PARK in Washington previously, but that BARTKUS did not stay with the family.

41. Bank records show that between December 2024 and February 2025, PARK sent three payments using PayPal to BARTKUS totaling $858.10, with the most recent payment on February 10, 2025.

42. BARTKUS's family member told the FBI that PARK deposited money into BARTKUS's bank account and explained that he/she saw two to three transactions for approximately $100 USD each in BARTKUS's bank account from PARK. BARTKUS told the family member that the transactions were payments for him doing work for "Steve." The transactions occurred approximately one month after PARK stayed with BARTKUS in early 2025.

18

### J.    PARK Boarded an International Flight Shortly After the Bombing

43.    On May 20, 2025, two days after the bombing, ABC News published an article that outlined the Palm Springs Police Chief's public statements to the media, including that "others may have known [the] suspect was planning [the] explosion" and "people with knowledge of the situation could face charges from the FBI." This article described FBI agents "combing through the suspect's home" in Southern California and further explained that law enforcement is "trying to determine a motive and figure out how Bartkus was able to get his hands on so many explosives."

44.    Based on travel records, PARK flew to Warsaw, Poland via Copenhagen, Denmark on May 21, 2025.

45.    Based on information from foreign law enforcement, PARK was detained in Poland by Polish authorities on May 30, 2025, and was ordered deported by Polish authorities on June 2, 2025. Based on information from foreign law enforcement, PARK attempted to harm himself after Polish authorities made contact with him.

46.    PARK arrived at JFK International Airport in New York on a flight from Poland at approximately 8:00 P.M. EST on June 3, 2025. Shortly after his arrival, he was arrested by FBI special agents at the airport.

### V.    CONCLUSION

47. For all of the reasons described above, there is probable cause to believe that PARK has committed a violation of

19

18 U.S.C. § 2339A: Providing and Attempting to Provide Material
Support to Terrorists.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 4th  day of June
2025.

_____
HON. DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

20

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>                        PLAINTIFF,<br><br>                    v.<br><br>DANIEL JONGYON PARK,<br><br>                        DEFENDANT | **WARRANT FOR ARREST**<br><br>ON COMPLAINT<br><br>CASE NO.:  5:25-mj-00400-DUTY |
|---|---|

TO:   ANY AUTHORIZED LAW ENFORCEMENT OFFICER

**YOU ARE HEREBY COMMANDED** to arrest **DANIEL JONGYON PARK** and

bring him forthwith to the nearest Magistrate Judge to answer a complaint charging him

with providing and attempting to provide material support to terrorists, in violation of

Title 18, United States Code, Section 2339A.

REC: BY AUSA          [Detention]

| | |
|---|---|
| June 4, 2025 | Hon. Douglas F. McCormick |
| Date | Honorable Name of Magistrate Judge |
| | _Signature of Magistrate Judge_ |

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at (location): | | |
| DATE RECEIVED<br><br>DATE OF ARREST | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |

DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO

## ADDITIONAL DEFENDANT INFORMATION

| RACE: Asian | SEX: M | HEIGHT: | WEIGHT: | HAIR: Black | EYES: Brown | OTHER: | |
|---|---|---|---|---|---|---|---|
| DATE OF BIRTH: July 19, 1992 | | PLACE OF BIRTH: | | SOCIAL SECURITY NO.: | | DRIVER'S LICENSE NO. | ISSUING STATE |
| ALIASES: Steve | | SCARS, TATTOOS OR OTHER DISTINGUISHING MARKS: | | | | | |
| AUTO YEAR: | AUTO MAKE: | AUTO MODEL: | | AUTO COLOR: | | AUTO LICENSE NO.: | ISSUING STATE |
| LAST KNOWN RESIDENCE: Kent, WA | | | | LAST KNOWN EMPLOYMENT: | | | |
| FBI NUMBER: | | | | | | | |
| ADDITIONAL INFORMATION: | | | | | | | |
| INVESTIGATIVE AGENCY NAME: | | | | INVESTIGATIVE AGENCY ADDRESS: | | | |
| NOTES: | | | | | | | |